FIRSTBANK OF ARKANSAS (formerly First
National Bank of Brinkley) *v.* Barbara A.
Cross KEELING

92-704                                    850 S.W.2d 310

Supreme Court of Arkansas
Opinion delivered April 5, 1993

*Elledge & Martin*, by: *Steven W. Elledge*, for appellant.

*Wilson & Associates*, by: *Kathleen Bell*, for appellee.

ROBERT H. DUDLEY, Justice. Barbara Keeling, the plaintiff, owned one lot in block 2 and two lots in block 3 of the original Town of Cotton Plant. Her home was situated on the lots in block 3, and some type of structure was on the lot in block 2. On May 27, 1988, the bank loaned $12,000.00 to the plaintiff. The plaintiff executed a $12,000.00 installment promissory note to the bank and a mortgage as security for the note. The bank also required the plaintiff to insure the property for $25,000.00, so she obtained a policy of insurance on the property from the Columbia Mutual Casualty Insurance Company. The policy, under the loss payable clause, listed her as the owner and the bank as the mortgagee. Subsequently, the plaintiff failed to make the installment payments, and the bank filed suit for foreclosure. On December 13, 1988, the chancery court entered a judgment against the plaintiff in the amount of $12,297.42 for principal and court costs, plus $754.39 interest to that date, $1,276.61 attorney's fees, $252.00 abstracting fees, and a $40.00 overdraft charge, or a total of $14,602.42 with future interest to accrue at the rate of $3.71 per day until satisfied. The chancery court ordered that if the foregoing amount was not paid the property was to be sold at judicial sale. A judicial sale, or foreclosure, was held on January 6, 1989. The bank purchased the property with a bid of $6,000.00. By that time an additional twenty-five days interest had accrued, making additional interest of $92.75 due. Thus, the total judgment debt was $14,695.75, and the bank bid of $6,000.00 left a deficiency of $8,695.17.

A little over two weeks later, on January 24, 1989, the plaintiff's home was destroyed by fire.

On February 1, 1989, the bank took a deficiency judgment against the plaintiff. On February 28, 1989, the lots in both blocks were conveyed by commissioner's deed to the bank. The bank did

not give notice to the insurance company of the change in ownership.

On July 21, 1989, the defendant bank sold the lots in block 3 to Dorothy Clark. Revenue stamps in the amount of $13.20 were affixed to the deed, indicating a sale price of $6,000.00. The conveyance was by warranty deed executed by the president of the bank, Eddie Melson, and the secretary of the bank, Chris Rainbolt. After this conveyance, the defendant bank held title only to the lot in block 2.

The insurance company questioned the parties' insurable interests but ultimately reached settlement agreements, first with the defendant bank and then with the plaintiff. In the first phase of its settlements, the insurance company paid the bank $12,682.00, and the bank executed a release by which it agreed to assign its deficiency judgment to the insurance company, hold title "in trust" to all of the lots, even though it had already conveyed away the lots in block 3, and "to convey it to Columbia or its designee upon request." In the second phase of its settlements, the insurance company reached an agreement with the plaintiff. It agreed to pay her $800.00, have the bank convey all of her property back to her, and release her from the judgment that had been assigned to it. In executing the settlements, the insurance company requested that the bank convey all of the property back to the plaintiff. The bank executed and delivered to plaintiff a quitclaim deed to the tracts in both blocks. The quitclaim deed was signed by the president of the bank, Eddie Melson, and the secretary of the bank, Chris Rainbolt. As would be expected, the plaintiff soon discovered that Dorothy Clark claimed title to the lots in block 3, and had a prior deed from the bank conveying the lots in block 3 to her.

The plaintiff and the insurance company thought that the defendant bank might have made a mistake in twice conveying the same property, for, after all, the bank had collected a total of $18,682.00 from Dorothy Clark and the insurance company. That was well in excess of the amount the plaintiff owed, and the insurance company asked the bank to correct the situation by re-purchasing the property from Dorothy Clark, or refunding part of the plaintiff's money. The bank refused to right the wrong. It left the plaintiff without title to the lots that she had re-purchased in

block 3.

Plaintiff then filed this suit against the bank in circuit court. She alleged most of the above-stated facts and concluded that the bank had breached the contract of settlement and "acted knowingly, wilfully, wantonly and in bad faith" and that its conduct was "outrageous." At the bench trial of this case, the plaintiff testified about her mental anguish and suffering, which occurred as a result of the bank's actions. At the conclusion of the trial, the trial court found the bank liable, apparently on the theory of fraud or deceit, awarded plaintiff $5,000.00 for her pain and suffering, and awarded her $10,000.00 in punitive damages. The trial court did not state the theory on which the damages were awarded, and the bank did not inquire into the issue, nor did it seek to have the trial court rule on the matter. It was up to the bank to obtain a ruling giving the basis of the trial court's ruling. *See Carpetland of N.W. Ark., Inc.* v. *Howard*, 304 Ark. 420, 803 S.W.2d 512 (1991). The trial court's comments indicate that it dismissed the cause of action for the alleged breach of contract because the plaintiff failed to prove the fair market value of the lots that she did not get, and that the verdict was based on the tort of fraud. One comment illustrating that the trial court apparently awarded the damages based on the theory of fraud occurred when the bank's attorney objected to evidence of the plaintiff's pain and suffering. The bank's attorney stated that pain and suffering were not relevant to a breach of contract action. The plaintiff's attorney responded that "our complaint was founded on fraud and the outrageous conduct of the bank and we alleged that mental anguish imposed upon her." The bank's attorney did not respond, and the trial court then allowed the evidence of mental anguish without further objection.

We do not address the bank's first two assignments of error because both of them concern asserted errors of the trial court in ruling on the breach of contract action. Again, the trial court did not award any damages based upon breach of contract.

The bank's third assignment of error contains arguments that deal with both the breach of contract action and the tort action. Again, we do not address that part of the argument going to breach of contract. We address only that part of the argument that concerns the tort action. The bank argues that the

terms of the contract between the bank and the insurance company release it from any liability for its fraud or deceit. The bank cites no authority holding that an agreement is effective to exonerate one from liability for fraudulent conduct inducing another to enter into a contract, and we know of none. In *Farmers Bank v. Perry*, 301 Ark. 547, 550, 787 S.W.2d 645, 646 (1990), we stated, "[T]his court has never upheld an agreement purporting to release a party from liability from his own negligence before it occurred." The reason for disfavoring such clauses is based upon the public policy of encouraging the exercise of reasonable care. *Id*. While it is not impossible for such an agreement to be enforceable, the clause must clearly set out the negligence for which liability is to be avoided. *Id*. See also, *Allen v. Overturf*, 234 Ark. 612, 353 S.W.2d 343 (1962). In summary, the trial court correctly ruled that the agreement between the bank and the insurance company did not release the bank from liability for its fraud or deceit, and that ruling was correct.

The bank next argues that the trial court erred in denying its motion for a directed verdict on the issue of compensatory damages. While the bank never really moved for a directed verdict on any basis, and certainly did not do so on the basis of impropriety of compensatory damages in a fraud action, it does not matter. This was a bench trial, and it is not necessary to move for a directed verdict at a bench trial in order to appeal on the basis of insufficiency of the evidence. *Bass v. Koller*, 276 Ark. 93, 632 S.W.2d 410 (1982). Even so, the bank does not argue in this appeal that the plaintiff failed to prove the elements of deceit, and we do not consider that issue. The bank argues that the trial court erred in awarding compensatory damages because they were not proper and the award was against the weight of the evidence. The bank offers neither a citation nor convincing argument for its contention that damages for mental anguish are not proper in an action for the intentional tort of fraud or deceit. As we have said many times, when the appellant does not cite any authority, nor make a convincing argument, and where it is not apparent without further research that the point is well taken, we will affirm. We will not do the appellant's research for him. *Dixon v. State*, 260 Ark. 857, 545 S.W.2d 606 (1977). The bank also argues that the award of damages for pain and suffering was against the weight of the evidence. The resolution of conflicts in

the testimony is not within the province of an appellate court; it is fundamentally a function of the finder of fact, and a finding is usually conclusive, especially where credibility of witnesses is involved. *Blisset* v. *Frisby*, 249 Ark. 235, 458 S.W.2d 735 (1970). Here, we cannot say the award was clearly erroneous.

■ The bank's final argument involves the award of punitive damages and is two-fold. The first part is that the trial court erred in granting compensatory damages, and, since compensatory damages are a prerequisite for punitive damages, the trial court erred in awarding punitive damages. Since we have affirmed the award of compensatory damages for the reasons set out in the last paragraph, the predicate for the argument about punitive damages fails. Thus, we dismiss the argument. The second part of the argument is that there was not sufficient evidence for the trial court to award punitive damages. Again, the bank did not raise the issue below. Even so, we must consider the alleged error in the assessment of damages. *Bass* v. *Koller*, 276 Ark. 93, 632 S.W.2d 410 (1982). The argument is without merit because if there is substantial evidence to show deliberate misrepresentation, fraud, or deceit, the issue of punitive damages may be submitted to the jury. *Stein* v. *Lucas*, 308 Ark. 74, 823 S.W.2d 832 (1992). Here, there was substantial evidence of deliberate misrepresentation or deceit.

■ In addition to the direct appeal by the bank, the plaintiff has filed a cross-appeal. At the trial, the trial court ruled that the plaintiff was not entitled to any damages for the breach of contract because she did not offer any proof of the fair market value of the lots that she re-purchased from the bank but which had already been sold to Dorothy Clark. The plaintiff argues that the trial court erred in refusing to recognize the revenue stamps affixed to the deed as fixing the fair market value of the lots. The plaintiff cites no authority for her argument, and we know of none. Even if the revenue stamps did represent the actual price paid by Dorothy Cook, the trial court did not know whether that amount was the true market value. The record does not reflect any details of her transaction with the bank, whether it was an arms-length transaction, or whether she paid more or less than the market value. Thus, the revenue stamps, standing alone, and on just one sale, cannot be said to be substantial evidence of the true market value of the lots. *See Tuthill* v. *Arkansas County*

*Equalization Bd.*, 303 Ark. 387, 797 S.W.2d 439 (1990). Accordingly, we also affirm on cross-appeal.

Affirmed on direct appeal and on cross-appeal.